All right, we'll call the next case of the morning, number 1710759, Drury B. Silberman. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. Mm hmm. May it please the court. And somehow we root for the plaintiffs in this case and amend it to the district court. What happens next? What would happen next? I take it this may go to the panel's mootness question on supplemental briefing. The relief that plaintiffs seek is essentially a recalculation of the premiums and indemnities that would have been available to them had they been able to exclude their low yield years. And so in that respect, the parties... And what is the government's position with respect to that claim on remand? Well, the government will do its best on remand to the agency to run those numbers through the policies and reinsurance agreements that... We do not know the exact sum at this moment of the reconciliation, and that's because in some instances the premiums would have been higher, but we also know in some circumstances after the fact now that some indemnities might have been paid out. And so the agency will go through those calculations to the best of its ability now after the fact. So premiums would be higher, but also coverage would be higher, and so presumably the plaintiffs didn't bring this case to pay higher premiums for nothing. They're hoping to get some, as you say, indemnity. Exactly. We would imagine that it would not be a very good case to go through all this trouble to win just to pay higher premiums for a year that's already happened if you didn't have any crop loss. That's right. And so presumably plaintiffs are betting now after the fact that that math will come out to their favor, but critically at the time of the sales closing date for their policies, for the winter wheat policies, the actuarial data was not in place at the time. How would you have granted them any relief, or how could they have obtained relief from you if there had been no data available to set the terms of the policy's benefits and its rates? Well, that's exactly why the agency could not permit the producers to elect the exclusion methodology at the time because there was no information available to implement the methodology and what that means to break that down in very concrete terms. And essentially that whenever they filed their complaint and when the district court ruled, there was no relief that could possibly be given to these plaintiffs because it was absolutely necessary for you to run the data, which had not been run, in order to grant the relief they sought. Is that correct or incorrect? The data would have been available by the time the agency completed implementation at the end of 2014. And so, again, we could— When was the suit filed? Your Honor, that was in—I don't have that date immediately in front of me, but there's no— Fall of 14, I think. Yes, that's right, Your Honor. But the whole point is that you did—the Agriculture Department did, in fact, make allowances for 75 percent of crops. It was just 25 percent of them that were not calculated in time for that crop year. That's right. There was, regrettably, a small subset of crops for the 2015 crop year by virtue, again, of the timing of how all of this works in the crop insurance market. We have a standard reinsurance agreement that sets the terms of risk-loss sharing between the agency and the private insurers, and that occurs in the summer. And we have the sales close date, the date by which the producers elect their policies, how much of their anticipated yield that they would like to insure, and that date fell at the end of September of 2014. And the agency, regrettably, needed two more months to put into place all of the data, the IT system. But that is actually—I don't know if it's common in the farming world, but it's not that uncommon in the insurance world to have an initial premium and to have the policy actually say, this is based on thinking you have 80 trucks, but we realize that that number varies over the years, and then suddenly Hurricane Harvey happened and we needed to get a bunch more trucks to go deal with that, and so now we had 100 trucks, and we readjust the premium. We, the insurance company, readjust the premium for you, the company, that suddenly had all these trucks, and that's done at the end of the year. So it is not an unheard of concept to have to do what you're going to have to do here if we affirm. Well, so two points, Your Honor. First, that's not the way that these agreements work with also this other element, the standard reinsurance agreements, where before the sales closing date, the insurance companies would have elected the amount of risk that they would like to bear in combination with the agency. And second of all, though, Congress has mandated that the agency maintain the actuarial soundness of this program, relying on actuarially sound data that, as I mentioned, simply didn't exist at the time. But it exists now, and you all have agreed it's not moot because you can give the relief now that we just discussed, the higher premium but higher coverage, whatever. And so while it may not be how things were ordinarily done, Congress passes this rule that throws a bit of a wrench into the usually done process, but it's not an impossibility. And it seems like you can, in fact, and you told Judge Jolly as much, if we affirm, you can go back and do it. We would, to the best of our ability, comply with it. Well, that's always true. But respectfully, Your Honor, the question here is one of statutory interpretation. No, I've got that. But I'm just saying that I could see an impossibility fence if something were impossible. You're asking me to do something on June 6th. You're asking me to do something last Monday. Today is the first time you asked me. Okay, that's impossible. But we don't have that here. It's not only not impossible. It's not even all that impractical. It's not perfect. It's not how you'd like to live the world. But it can be done. So then why, when we're looking at whether we can reconcile all of these statutory provisions, why isn't that the reconciliation? Because, Your Honor, that is an invitation to ignore Congress's statutory mandate to maintain the actuarial soundness of the program, to set premiums in an actuarially sound manner. The court would effectively be saying that the corporation can set rates, it can pick a number out of thin air where it's not supported by data. And that is not how the crop insurance program is run. But that's clearly, but that, excuse me, but that doesn't seem to jibe with the record here because the department was, in fact, able to pick rates within seven months for 75% of the crops, and apparently with actuarial soundness. So what, I mean, I think I'd have to hear something more explicit about winter wheat or whatever the other crop was that made it so difficult. You don't have actuarial soundness on the basis of crop by crop, do you? Well, Your Honor, I think this is an important point, that it's not possible, as plaintiffs might prefer to frame this case, to just prioritize one particular crop over the other and to look at this in front. Well, the department did because it complied with this. It gave this benefit to all of the farmers of 75% of the covered crops within, you know, oddly enough, the peanuts and the cotton farmers got a better deal than the winter wheat farmers. No, and two points there, Your Honor, in response to your question. The agency did not prioritize certain crops over the others. The agency finished implementation. Excuse me, but your argument says that the plaintiff's, your brief explicitly says that the plaintiff's argument would interfere with the priorities set by the department. The agency, in its expertise, carried out all of the initiatives, the new programs, new insurance products contained in the 2014 Farm Bill. There was much work that was universal to several of the programs and to all of the crops. And so it is not as if the agency, for example, said, well, we're going to start working on a spring crop before a winter crop. Okay, now tell me, you're claiming Chevron deference here, correct? That's correct. Now tell me why you're entitled to Chevron deference. Yes, Your Honor, because it's simply unclear an implementation deadline in the exclusion provision itself. Congress did not contemplate, much less dictate a drop dead deadline in the absence in that, within that statutory ambiguity is within the agency's discretion to reasonably determine that it must, that it cannot provide for this methodology, this new way of calculating crop insurance until the necessary actuarial data is in place. And that makes perfect sense because, as I mentioned earlier, otherwise, the agency would be setting rates in a manner that wouldn't be supported by the numbers, and it would risk, actually, the larger integrity of the crop insurance program, and in some ways, prioritize those winter wheat farmers for that particular crop, as opposed to all of the producers in the community, which receive subsidies from the government, both to pay their premiums. Okay, now give me your legal analysis. I mean, applying Chevron applies here. One, two, three, and just how this falls within the general principles of Chevron analysis. Yes, Your Honor, and as we laid out in our brief, there is no implementation deadline contained in the exclusion provision. Yes, that's correct. Yes, and so the agency reasonably interpreted that absence of a deadline to require actuarial data in place, a series of administrative actions and groundwork, the data, the IT systems to process and receive the data, and then the actual calculations, the actuarial processing to set the rates, before it could allow producers to exclude those low yield years. So under your argument, the plaintiff's claim was there were immediate relief now, however you may get it, whether it's correct or incorrect, is that true? Yes, that is what plaintiff's position is, and even plaintiffs… Is that why they filed this lawsuit? I mean, at least as I understand it, eventually they're going to get their rights and benefits and rates that are provided by the latest amendments to the Agricultural Act at some point in the future, and you don't have any dispute about that? Well, because the agency was able to complete… Do you have a dispute about that? We don't dispute that these farmers were able to take advantage of the methodology in subsequent years because the agency completed expeditious implementation in less than one year. You're saying you are not covering them for the 2014-15 crop year, period. That was the position of the NAD. Certainly the farmers were able to elect insurance that… They got insurance, but they didn't get the benefit of this exclusion provision for the 2014-15 crop year, although 75% of the crop farmers did, and so they are being hurt unless there's retrospective re-evaluation. That's what I wanted to ask you next. Yes, so they were not able to take advantage of the exclusion methodology. What's your position now about giving them retrospective relief to the same extent that you granted the 75%? Well, that 75% was not retrospective, just to be clear. I understand it was not, but I'm saying they got the relief. As I understand it, 25% did not get the relief. Are you willing to give them the same relief that the 75% received? Well, this goes to our earlier discussion, Your Honor, that we would… Yes or no? Are you or are you not? Well, yes, we would comply with an order from this court to recalculate the difference and reconcile in compliance with the district court's interpretation of the statute, but… If you've got to have an order from us to do it, what is your excuse for not granting the same relief to the 25% in a retroactive fashion? Well, Your Honor, we simply couldn't at the time when plaintiffs… I'm talking about now, retroactively now. Because that… You've got all the data now. Why wouldn't you go back and make compensation for them? Or can you do it? I don't know. Well, we would try to the best of our ability, but Your Honor, the answer to your question is that that is an incorrect interpretation of the exclusion provision of the Crop Insurance Act. And it imposes obligations that are entirely inconsistent with the mandate to maintain the actuarial soundness of the program. And, in fact, the corporation does not have authority to offer reinsurance without the necessary actuarially sound data in place as determined by the corporation. So your answer to my question is that 25% have missed out altogether with respect to the benefits that the 75% received. But, Your Honor, Congress amends the Crop Insurance Act from time to time, and the crop insurance program is ongoing throughout every calendar year. But you didn't answer my question specifically. I mean, what about this 25% that we hear about? I mean, are they just shut out in the cold with no chance of relief in the winter? And these winter wheat farmers are a smaller subset of that 25%. Presumably there are producers who did not estimate that it was to their advantage to file suit. If you answer my question, are they not going to get the benefit that the others received? You're not going to grant any retroactive benefits resulting from these amended statutes? I see my time is up. May I answer? Your Honor, those plaintiffs have not preserved the election. They have not filed suit. Oh, okay. Thank you. Thank you. Okay, you have time for a vote. All right, Mr. Todd. Thank you, Your Honor. May it please the Court? My name is Jeff Todd, and I represent several West Texas wheat farmers in this action. And to answer your question is that our clients, the Applees in this case, did follow the law. The law was specific that this APH exclusion was available whenever an APH policy is issued or whenever the corporation uses an APH policy. All of these policies, in effect, were APH policies. So it shall apply whenever they do that. That law came into effect in February of 2014. The deadline for us to elect our policies was in September of 2014. So several months between the time that the law became effective to the time of our deadline. And on that date, the law also says that producers have the opportunity to elect this benefit. It's going to cost more. And so, for example, a wheat farmer in Iowa that has not been suffering catastrophic droughts would not do that because their APH, their production history, would be solid. But what happened was in West Texas, in Haskell County, Texas, south of Seymour, north of Abilene, that area had been suffering from catastrophic droughts for year after year after year. And so these farmers, their production history had holes in it. And so what that did is it brought their yield down. It brought their availability to obtain insurance down to the effect that they could hardly even break even. So bankers require insurance, crop insurance, to fund loans. And so this was the important part, and this was the important measure in the 2014 Farm Bill for West Texas farmers. I have this question, too, in connection with this one thing, is how are we going to get that relief if the position of the Department of Agriculture was we cannot come up and determine the dollar amount of relief that you're entitled to, either in terms of rates or benefits? And if you can, their argument about the actuarial accuracy precludes the relief you seek. Right. Just answer that. Yes, Your Honor. The first, the actuarial versus, that's really the canon of construction over general versus specific. If you look at the specific statute that they cite on actuarial, it's very general. It just says, look, FCIC, you need to make sure your programs are actuarially sound. Do the best that you can to make sure they're actuarially sound. But FCIC, in this case, used that as a sword to prevent the specific implementation, the specific application of this statute, which by its own language in 508G4, said that this will be available whenever the corporation issues these policies. It's very specific, very broad, and specific to us. May I ask a question at some point? Thank you. What is the bar to your receiving retroactive relief? There's really no bar. There was no bar to them providing this information prior to September of 2014. It was just a priority for them. But all the statute requires is that it's available and that we elect. I mean, it's really pretty easy for them. I only have 100 clients. From this record, 100 clients, 100 farmers in Oklahoma, Texas, and Colorado, and Kansas are the only ones who elected this. So it would be very easy for them to come back and do it retroactively. The statute only requires that it's available and that we elect. We checked both of those boxes, and therefore they could come back now because we wouldn't even know if it would benefit us other than the banking until the summer. Well, my question is this. Your clients missed out on this adjustment for one year. Presumably they've gotten the adjustment for the subsequent crop years, right? Yes, Your Honor. So what difference has it made to them? Thousands of dollars. I believe that there's millions of dollars at stake. Why? Because in 2014, for the 2015 wheat year, which starts in the fall of 2014, they would have had a lower insurance guarantee because of their deflated APH. Had they been given this benefit, the papers would have been recalculated. They could have excluded the catastrophic years, which were three or four years in this 10-year period, and their insurance guarantee would have been higher. And it turns out, for the 2014-2015 year, they had significant losses again because of drought. Well, that's what I was getting to. Oh, I would not be here today if it was not financially beneficial to our clients. That was the assumption that I made earlier. But I guess why doesn't the analogy that I used of these kind of insurance policies where they say we're going to base the premium on your representation of 80 trucks, recognizing that you might end up with 100 trucks, and then we reevaluate the premium and readjust everything after we know how many trucks there were. I mean, I realize this isn't about trucks, and I realize it's a different policy. But why doesn't that process work here as a fix for this, not as how you deal with it going forward? Well, it could have absolutely worked, Your Honor. And there has been other instances where the FCIC has come in and extended deadlines. They could have extended the deadline for the election. They could have said, well, you can let us get this to work because we did 75% in two months, actually, because they started in October and got it done in December. Let us work on this 25%, and we'll get it done by December, and you can elect then. Because still, no one really knows whether it will benefit them until harvest. Let me ask you about that. Wasn't it called the RMA that was sent out that said you can take the election, something like that? The Risk Management Agency. Yeah, the RMA sent out the notice to people. And didn't they send a notice that implied that they could take it, right, which is why your clients all took the election? Oh, no. No, Your Honor. I got it backwards. Yes. So RMA is basically the agency that governs crop insurance. They would have sent a notice to the AIPs, the approved insurance providers, which are the insurance companies. And told them to send a notice to the farmers. Sent a notice to us. Right. I mean, I read those opinions, and I'm just a little balled up on it. Yeah. And so, to me, this is my very brief Kansas, small town, weak farmer boy explanation of this. This was just really a Jedi mind trick by the agency to convince folks you can't elect. That's why, as far as I know, only my clients have elected and qualify for this. Because they said in this interim rule, oh, it's not available until there's actuarial information. Well, each farmer can go on the website and look at the actuarial, and it will say, oh, it's not available. So they basically just told everyone it's not available. So a lot of people just waived their rights. They just lost it. Absolutely. Okay. And was that sent out only as to the winter wheat farmers, or was it sent out to all of the farmers? Well, it would have been sent out to only the folks who elected. All right. So RMA sent the AIPs guidance on how to respond to all these elections. And so, in various ways, the AIPs notified us. I may have misread this, but I thought in the briefs it said that the cotton farmers and the peanut farmers were taken care of. They were. Well, so did they get that kind of notice that discouraged them? No, Your Honor. And the timing of this is very important, and it goes to one of the arguments in the brief. The director, for example, relied on Congressman Conaway, who in July of 2014, after he started pleading with them, at least take care of the cotton farmers, at least take care of the spring crops. The timing is very important because on July 1 is when RMA published the interim rule that says you only get this yield exclusion if there's actuarial documents. You're not implying that there's politics involved. Oh, no, never, Your Honor. All right. Well, I'm glad about that. So, of course, by that time, Congressman Conaway was told your wheat farmers in West Texas are not going to get it. So he stepped in to the next level. Trust me, cotton farmers in West Texas have a lot of pull. So Congressman Conaway started pushing at least take care of our spring crops. Man, I wish they hadn't. I had all kinds of cotton farmers lined up, but they fixed it. But the deadline for cotton farmers is March 15 of 2015 because it's a spring crop. So it was all about this timing, and they said, oh, we hustled around. And so from October to December, they worked on the spring crops. I guess what I'm wondering, so originally when I was reading all this, and I don't have a very good context for it. I'm not a wheat farmer from West Texas. But I was thinking, well, you know, nationally there's a lot of data. This is a hard thing to do. But the way you postured it at the beginning of your argument made it seem like you kind of know where there's been a drought. You kind of know where there's been a hurricane or a problem. And so it's a more focused inquiry. We don't have to go calculate, you know, the wheat farming in Florida that is nonexistent. We try to go and deal with where we think the action is and prioritize that way. Did the agency try to do that? To the best of my knowledge, based on the record, they did nothing. They just simply said we are not going to do it. So they just went barreling through the normal course of business. Well, you know, it's harder to do this stuff. We'll just try to do our best. Instead of saying, hey, this is an area that's had a lot of drought. Let's prioritize that over an area that hasn't had drought or issues and has sort of had normal crop years for the last however many years. And what I would say, Your Honor, is that they essentially rewrote the statute. The statute says that this APH exclusion shall apply whenever they use production records to determine the actual production history. Now, one of their arguments, of course, is that in that 2014 farm bill, Congress set implementation deadlines for certain parts of it, right? They sure did. And not for this. So what are we to make of that? Well, because if you look at the statute, we have already this application requirement that says that the yield component, the 508G4, shall apply whenever they use production records to determine APH. And so there wasn't any need for an implementation. And, Your Honor, I would cite to their case. If you look at the cases they cited for this implementation versus applicability issue, none of them apply. And, in fact, if you look at the Hubberman case, the 884F2nd62 case from 1989, that's the only one that even closely, even remotely, comes to this issue. And you know what? That dealt with the Food Security Act of 1985 and a food stamp program. And they were trying to determine whether this modified added benefit that President Reagan put in for food stamps would apply immediately or you'd have to wait for regulations. And there the court looked at a 1981 amendment where the act said it would be effective and implemented upon dates as the Secretary of Ag prescribes, taking into account the need for an orderly implementation. And in the Hubberman case they said, see, the failure to use similar language like that in the 1985 act strongly supports Hubberman's position that she was entitled to it immediately. And so the only case that they cite that is remotely close to this issue actually supports us. And so, Your Honor, I would, again, I would just say that they're trying to rewrite that applicability to put a comma behind it and say, unless we are too busy to get it. And actually, I mean, the interchange you and I had draws into question whether they're really too busy, maybe too busy to get nationwide every crop under the sun, so to speak. But it seems to me it's a known and at least knowable fact. What are the regions and the crops that might have the need for this as opposed to just randomly and unnecessarily calculating the world? Absolutely, Your Honor. The USDA is a fact data gathering entity. They have the National Agriculture Statistics Service, and they have this data, and they do it continuously. Well, and I assume they have computers. What is the relief specifically? You will tell us in words what you would like for us to hold in this case for your benefit. Well, we would like you to affirm the District Court Cummings decision and direct the FCIC to grant us the benefit that we elected, which is the APH exclusion for the 2015 winter wheat crop, which would simply be that they would have to go back, look at the actual data of what happened, look at whether there was a loss, look at what years could be excluded for Haskell County and the surrounding counties, and pay it. They already know it. Why do they refuse to do that? What is their position, as you understand it? My understanding, and during the administrative hearing we actually had the acting administrator under examination, and my understanding is that they just are taking the stance that if we don't have time to do it or if we don't want to do it, you can't force us to do it. It's really a roadblock to where this agency just does not want producers telling them what they should do. And from my perspective, they don't want producers telling them that they got it wrong. May I ask a question, please? Why is that entitled to a Chevron deference? Well, because it's not ambiguous. I mean, you don't even get to Chevron because you just look at the statute on its face, and there's nothing ambiguous about the language. Thank you. I hate to throw a wrench into this, but in essence you're seeking a money judgment from the government, are you not? Well, we can't actually do that. You're darn right you can't, not in this court. Well, we can't even at the administrative level, because through a NAT appeal, our only remedy is to a National Appeals Division appeal through the USDA. Our only remedy is for them to tell FCIC that they did it wrong, that they erred. So it doesn't go in like the Tucker Act or something like that? Unfortunately, no. I mean, we have to go back, and sometimes we have to come back. Well, I'm not sure whether the Tucker Act, I don't know enough about it, but you don't want to have to start over in a different court system. No, no. I think here, based on their representations, if we prevail, that they will go back and pay. The numbers are all there. It's all set up. I mean, it could be done. But it goes back to the FCIC for that process, not directly the court. Yes. The court is simply interpreting the statutory issue. Absolutely. It's just whether we properly elected our benefit and whether we're entitled to that benefit. Yes. Okay. And your position is that they are arbitrarily and without reason denying you this benefit. Arbitrarily. Simply because they don't want to be told how to administer their own act. Yes. It's getting pretty close to Chevron numbers. Well, I just believe that they are not in compliance with law. I mean, the law is clear that it was available. If the statute is clear, we never get to any kind of deference. You've got to follow the statute. That's your position. Absolutely. The law. Yes. Okay. All right. Thank you. Ms. Traer? Yes. Okay. Thanks. Thank you. I'd like to make just a few quick points on rebuttal. First of all, plaintiffs have not identified a statutory hook for why the exclusion provision should have been fully implemented by the date on which they sought to do so. Well, it says it shall apply. It's the 2001 statute that this provision shall apply to crop years following 2001. And that's this G4, whatever it is, got inserted directly into that. Yes, but the applicability provision does not speak to implementation. And as Your Honor pointed out, there are other provisions within the Farm Bill where Congress prioritizes. Well, let me ask. We understand that, but I think it's a very important point that they say that none of the authorities you cite for this distinction between apply and implement supports your argument. So I would like to hear something about that because that's, you know, fundamental to what you're saying. Yes, and we obviously disagree. That's not correct. And I would point the panel to, in particular, some of the D.C. Circuit cases that we cited where there was a statutory mandate for certain programs to take effect by a specific date certain. In one case, it was, I think, November 15th of 1992. And the court said, looking at that language, take effect. It is ambiguous. We don't know if that's referring to the legal effectiveness of the program or whether Congress meant produce results fully. And in that circumstance, the court said, and I'll quote, and this is from the NRDC, the EPA case, 22F3-1125. We perceive no want of logic in a construction of the statute that recognizes three distinct steps to compliance. The point at which a program is promulgated, the point at which it takes legal effect, and the point at which it is fully implemented. And here, actually, I think it's very useful to look at the contemporaneous legislative history. The conference report at the time also explicitly recognizes the difference between the effectiveness of the exclusion provision, the availability of that methodology, and the feasibility of carrying it out. And Congress said, to the extent it is not feasible to carry it out right away. So Congress recognized that. Even plaintiffs recognized that implementation would not have been available from day one, as the district court said. But because they are now, why are they not entitled to benefits retroactively? He says that eventually he's going to get it, that they're going to get it eventually. But you're just refusing to do it for purely arbitrary reasons and not giving any reasons as to why they cannot be entitled to this on a retroactive basis. No, it is not for an arbitrary reason, Your Honors. Because providing insurance, inclusive of the methodology at the time, would have violated other statutory mandates. It would have risked the actuarial soundness of the program. And a ruling to that effect would basically be saying to the agency, you don't have to worry about actuarially sound data being in place when you set rates. And I don't think anybody wants that. You're refusing to give them any benefit of the statute because it interferes with actuarial rates at the time that they claimed the benefit to be claimed entitled to the benefit. We're not refusing to give them a benefit writ large. They were able to elect the exclusion for the next crop year. But contrary to plaintiff's position, the statute does not say, do your best to work with actuarially sound data. It says that the corporation needs actuarially sound data to have authority to offer. But the corporation has computers. They have data. They made their own priorities. I mean, frankly, I think you could have gotten it done, and you didn't get it done. So it's not some impossibility. Again, it's not telling me today you needed to do something on Monday. Well, Monday's passed. I can't go back and do it. You all have computers. You have data. I'm not saying it's easy. That's not my point. But my point is that you have the resources to get this done. It's not unavailable to you. The data exists. It's a matter of putting it together in a way that's actuarially sound. Take your honor's point, but respectfully, no, it wasn't possible at the time. And as one very concrete example, Congress instructed the agency to offer this methodology on a per-planted acre basis, which had not been previously ordered. And Congress asked the agency to do that for another program being carried out by the Farm Service Agency and this one. The agency had to gather that data in a new way by crop, by county, by irrigation practice for the past 10 years. But that's not true here. That's for this, yes, for this particular. Well, but doesn't it fundamentally undermine your argument that you were, in fact, able to do this for 75 percent of the covered crops? No, your honor. Within that crop year. I'm sorry. Just to be clear here, it's not that, and I see my time is up, if I could answer your question. Yes, of course. It is not that the agency prioritized one crop over another. It took a certain amount of time in order to complete the data gathering, the processing, in order to allow any producer to elect the methodology. And plaintiffs seek to paint this case as an unreasonable delay case, which they have not framed. And frankly, other plaintiffs in unreasonable delay cases probably wish an agency would act as quickly as the USDA did here to complete full implementation in light of all the work that I've described within less than a year. Was there evidence in the record about the unfeasibility of gathering these data for winter crops? Yes, your honor. For that, at ROA.1229 and.1241, there is testimony going to how the actuarial, the program integrity, the actuarial soundness of the program would have been at risk had the agency permitted someone to self-execute to choose the methodology without the necessary data at place. And that's, again, because going back to our earlier discussion of the way that. But that's not the point. The point is whether. Well, we'll read the testimony. We have we have your arguments. We urge this court to reverse. Thank you. The court will be.